IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-01736-WDM-KMT

GEORGE CHAMBERS,

　　　　Plaintiff,

v.

PROWERS COUNTY HOSPITAL DISTRICT (d/b/a PROWERS MEDICAL CENTER)
and
QUORUM HEALTH RESOURCES, LLC,

　　　　Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT
## AND OTHER PENDING MOTIONS

---

Miller, J.

　　　　This matter is before me on the Motion for Summary Judgment (doc no 34) filed by Defendant Prowers County Hospital District ("Hospital"), the Motion for Summary Judgment (doc no 35) filed by Defendant Quorum Health Resources LLC ("Quorum"), Defendants' Motion to Strike (doc no 62), Quorum's Second Motion for Summary Judgment (doc no 63), Plaintiff's Motion to Strike Quorum's Second Motion for Summary Judgment (doc no 67), and Plaintiff's Motion for Leave to Amend Summary Judgment Responses (doc no 69). The motions are all opposed. Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motions for summary judgment filed by Defendants will be granted. The motions to strike and to amend are granted and denied as set forth below.

<u>Background</u>[1]

This is an employment discrimination lawsuit pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA"), and the Family and Medical Leave Act, 29 U.S.C.A. § 2611 *et seq.,* ("FMLA"). Plaintiff was an employee at the Hospital, located in Lamar, Colorado, from September 14, 1992 to May 24, 2006. He was hired in 1992 as the manager of the respiratory therapist department and worked in that capacity until 2005, when the events at issue in this lawsuit occurred. Quorum provides management consulting services to the Hospital and provided the Hospital's CEO, Greg Gerard ("Gerard") around 2004.

During his tenure, Plaintiff had generally good performance reviews and received favorable feedback on the communication and interpersonal aspects of his job. He did, however, have some disciplinary history. A memorandum to his disciplinary file from 1992 addressed an allegation that Plaintiff had smelled of alcohol when reporting to work; the matter appears to have been resolved without further discipline. There was also an incident in 1993; a coworker reported that Plaintiff had gotten angry in response to an inquiry, slammed his hand down on the counter, and screamed obscenities at her. A statement from another witness corroborated this account. Plaintiff apologized for losing his temper and was given a "First Warning" (oral). Exh. B-15 to Hospital's Motion for S.J. (doc no 34-25). He was given a warning in 1996 and another in 1997 regarding

---

[1]The facts set forth herein are taken from the parties' briefs and attached exhibits and are undisputed, unless otherwise noted. Where disputed facts are material, I have set forth Plaintiff's version of the relevant events. I have eliminated from the recitation of facts any allegations supported by evidence stricken pursuant to Defendants' Motion to Strike, discussed below.

use of sick time.  Exh. B-16 (doc no 34-26) and B-17 (doc no 34-27) to Hospital's Motion for S.J.  In 2000, he was given another "First Warning" (oral) for speaking in a "loud and angry tone" and using profane language with a coworker.  Exh. B-19 to Hospital's Motion for S.J. (doc no 34-29).  Plaintiff did not dispute the basic facts or discipline regarding these events.

Plaintiff took leave pursuant to FMLA from March 4, 2005 to July 5, 2005. Plaintiff contends that after he returned from his leave, Gerard was less congenial towards him and took his budgeting responsibilities away.  On October 20, 2005, Karen Bryant ("Bryant"), the Chief Support Services Officer at the Hospital, received a report from another employee, Joyce Stapel ("Stapel"), which stated that Plaintiff had approached her in the lunch room, apparently quite angry, and demanded to speak with her privately.  This was confirmed by several witnesses who were seated with Stapel at the time.  Stapel thereafter met with Plaintiff in a small room.  Stapel told Bryant that Plaintiff had shut the door, blocked it with his body[2], leaned towards her and berated her regarding some issue concerning Plaintiff's wife, who also worked at the Hospital. Among other things, Plaintiff allegedly said, "I believe you are the biggest two-faced bitch in this facility."  Stapel Written Statement, Exh. A-1 to Hospital's Motion for S.J. (doc no 34-3).  He accused Stapel of undermining his wife and warned Stapel, "But, I'll get you, you just wait because I'll get you."  *Id.*  No one witnessed this interaction. However, another employee, Lori Abeyta ("Abeyta") witnessed Plaintiff and Stapel leaving the room afterwards and testified in a deposition that she told Bryant and Gerard

---

[2]It is undisputed that Plaintiff is physically much larger than Stapel.  It appears, however, that there was another exit door in the room.

that she observed that Plaintiff and Stapel were calm and had made remarks along the lines of "I hope we can remain friends."

Bryant contacted Gerard and had Stapel repeat the details of the incident in a meeting with the three of them. Plaintiff was then brought in to explain his side of the story. He admitted the basic details of the incident but denied using profanity or threatening or intimidating Stapel. According to Plaintiff, Gerard called Plaintiff a liar during this meeting. Stapel was asked to write a written statement of the events but Plaintiff was not. Bryant interviewed the persons who were sitting with Stapel in the lunchroom and also apparently interviewed Abeyta, although Bryant did not recall this interview when asked about it in her deposition. Bryant did not ask Plaintiff to provide her with names of witnesses; it is undisputed, however, that no one witnessed the actual conversation between Plaintiff and Stapel.

Gerard imposed a seven-day suspension on Plaintiff pending the investigation. According to the written memorandum of the suspension, the conduct at issue included Plaintiff's decision to involve himself in a workplace matter unrelated to his department, his action of approaching a peer in an angry and confrontational manner in a public setting, his inability to separate his personal and professional interests in a work place dispute, and his actions creating a climate of hostility and divisiveness, all of which was inconsistent with the Hospital's Standards of Excellence (i.e., its workplace code of conduct). See October 24, 2005 Memo, Exh. A-2 to Hospital's Motion for S.J. (doc no 34-4).

After the investigation, Gerard and Bryant concluded that Stapel's story was basically true. In order to maintain his employment, Plaintiff was required to agree to

4

the following conditions:

> 1. Admit to CEO comments made to [Stapel] in private;
>
> 2. Apologize to [Stapel] in the presence of CEO for inappropriate behavior and comments;
>
> 3. Apologize to Management Team for not following the Standards of Excellence;
>
> 4. Adhere to a Performance Improvement Plan to be developed by CEO upon return; and
>
> 5. Provide a written statement to CEO admitting to inappropriate behavior and comments. In addition, this statement must include your understanding that if behavior deviates in anyway in the future it will be grounds for immediate dismissal.

Exh. A-3 to Hospital's Motion for S.J. (doc no 34-5). Plaintiff signed the statement of

conditions and submitted a written statement containing the following:

> I am aware + regret that my behavior was not consistent to the PMC Standard of Excellence. I involved myself in a workplace matter that did not concern my department. I regret approaching a peer in an unprofessional manner. I sincerely apologize for my behavior and discussion involving another manager. I understand that if my behavior deviates from the Standards of Excellence it could be grounds for immediate dismissal.

Exh. A-4 to Hospital's Motion for S.J. (doc no 34-6). Gerard also removed Plaintiff from

his manager position for 90 days, with the possibility of reinstatement to be reviewed

after that time. Plaintiff's Performance Improvement Plan ("PIP") was commenced as of

November 1, 2005; it was to be evaluated every 30 days[3] and could be extended

beyond the initial six month period at management's discretion. Performance

---

[3]Plaintiff's evidence, however, shows that only a few reviews occurred during this time.

Improvement Plan, Exh. A-5 to Hospital's Motion for S.J. (doc no 34-7).

Plaintiff apparently complied with the terms of the PIP until at least May 2006. Plaintiff was not reappointed to his previous position as manager. However, as a result of a reorganization and consolidation of three departments, including Plaintiff's, Plaintiff was appointed to the position of "supervisor" of the Cardio-Pulmonary Department effective April 19, 2006. Stephanie Martinson ("Martinson") became the manager of the three consolidated departments. Plaintiff's duties as supervisor were largely similar to those he had previously exercised as manager, although there is some ambiguity about his responsibilities for scheduling. As manager, Plaintiff had made schedules for the respiratory therapists and approved or denied time off. As supervisor, he continued to make the schedules but it is unclear whether he had the authority to approve or deny time off; he contends that he would simply record the scheduling requests and approved time off as given to him by the other employees. His job description did not expressly include responsibility for scheduling, but it did require him to "perform any other job-related instructions given by [his manager], subject to reasonable accommodations." Job Description, Exh. B-33 to Hospital's Motion for S.J. (doc no 34-43).

On April 18, 2006, Plaintiff submitted a request for time off from May 18 to 22, 2006. The request was approved. Abeyta was originally scheduled to work the night shift of May 19, 2006; however, she submitted a vacation request for that day that was also approved. No respiratory therapist was scheduled for that time. According to the Hospital's policies, "If vacation requests are submitted with the same dates by two employees of the same department, and the employees are not able to effect a satisfactory compromise, the department manager will make the decision based upon:

6

1) Seniority – if the requests are turned in within one week of each other [or] 2) Earliest request – if the time span of the two requests is greater than one week." Exh. B-5 to Hospital's Motion for S.J. (doc no 34-15). Plaintiff asserts that he alerted Martinson to the scheduling problem in April; Martinson contends that she did not learn of this gap in coverage until approximately May 15, 2006. On May 16, Martinson approached Plaintiff about the problem. Plaintiff suggested that a student respiratory therapist work the shift with a licensed therapist on call. Martinson disagreed with this, although this type of arrangement had previously been used when Plaintiff was the manager and was later codified as an acceptable practice. In the past, when Plaintiff was the manager, he would have worked the shift if he could not find anyone to work. Martinson, however, was not licensed as a respiratory therapist and could not fill in. It is undisputed, however, that she had the authority to direct any of the respiratory therapists to cancel his or her time off and work the shift.

According to Martinson, Plaintiff refused to further assist in solving the problem. Martinson viewed scheduling as Plaintiff's responsibility; Plaintiff maintained that he was only a scrivener and that the problem belonged to Martinson as the manager of the department. He also contends that he tried to find someone to work but was unsuccessful. Martinson ultimately told Plaintiff that he had to either find someone to fill the shift or work it himself.[4] Plaintiff stated that since he was no longer a manager, it was not his responsibility to cover gaps and that he would take his vacation, which was

_____

[4]Although the Hospital's policies permit management to deny vacation requests, there is no express provision regarding "revoking" previously granted vacation leave. It does not appear that any other employee's vacation time was ever revoked.

for his nephew's out of town wedding.  Martinson was informed by some employees that before leaving, Plaintiff had told the other therapists not to answer their phones on that day, but at least one employee said she thought that Plaintiff was just joking.  Martinson filled the shift by using a nurse who was a registered respiratory therapist in Texas, but not yet in Colorado, and the student employee, with one of the other respiratory therapists on call.  Plaintiff contends that Martinson could have used a temporary staffing agency; Martinson states that temps were usually used for longer term intervals with more advance notice.  Martinson does not recall whether she contacted a temp agency to find someone to fill in that night.  It appears that there was one other respiratory therapist who was not scheduled for vacation but had a regularly scheduled night off.  Martinson does not explain why she herself did not direct this employee to work that night; rather, she maintained in her deposition that Plaintiff could or should have done so because scheduling was his responsibility.

Before leaving on vacation, on May 17, 2006, Plaintiff approached Martinson and again reiterated that he was not responsible for covering the shift and that the student could adequately cover with a regular respiratory therapist on call.  According to Martinson, Plaintiff was angry and hostile, blaming Gerard for the problems with the department, and stated that Martinson's state nursing license would be in jeopardy if she continued to manage the department.  He expressed his belief that her managing the department was illegal and that the state would come in and "cut her heart out with a knife."  Plaintiff maintains that he said the state would "cut our heart out with a knife," and that he meant to express his concern that the state would shut down the respiratory therapy unit.  He also denies that he was hostile or threatening.  Martinson alleges that

Plaintiff was aggressive and intimidating in this conversation and made a stabbing motion to illustrate his point, which she found threatening. Plaintiff said he was sorry about the situation and left. Martinson reported these events to Gerard and Bryant by email.

Gerard sent Martinson and Bryant an email in response, which stated:

> wow! what a statement - very inappropriate and not true. nothing is different now from when he reported to the CNO/CCO! just another layer b/t him and the CCO! he's lost it stephanie. he cannot accept change and he's behaving as someone who realizes he's not relevant anymore. hang in there! it will be better soon. thanks for everything - you are doing a great job and the RT staff need someone like you as their boss. he knows it is unraveling.

Exh. 12 to Plaintiff's Response to Hospital's Motion for S.J. (doc no 58-13).

Plaintiff's employment was terminated upon his return from vacation on the grounds that his behavior violated the Hospital's Standards of Excellence and occurred while he was still on a PIP. The memorandum summarizing the reasons for his termination included the following:

- His decision to leave the campus on May 17 without permission, leaving the respiratory therapist student employee unsupervised.

- His refusal to work on May 19, which was considered insubordinate conduct.

- His unwillingness to assist Martinson with the staffing problem.

- His telling other employees not to answer the phone if contacted about working the shift.

- His failure to communicate the staffing problem.

- His remarks to Martinson regarding her leadership, and his comment that the state would "cut out her heart with a knife."

- Violations of policy by clocking in as a callback.

May 24, 2006 Memo, Exh. A-7 to Hospital's Motion for S.J. (doc no 34-9).

Plaintiff disputes that he violated the clocking rules and he had no opportunity to rebut this accusation. Martinson simply looked at his time records while he was gone and determined he had improperly clocked as a callback, which entitled him to additional pay. Plaintiff contends that he was authorized by managers other than Martinson to be clocked as a callback. He also disputes that he did not timely inform Martinson of the staffing problem on the 19th. In his deposition, Plaintiff admitted that not following his superior's instructions could be "construed" as a violation of the Standards of Excellence. The Hospital has a grievance process but there is no evidence that Plaintiff used it to challenge either the disciplinary decision or termination decision.[5] Plaintiff was replaced by a respiratory therapist who was younger than 40 years old at the time.

Plaintiff filed a charge of discrimination with the EEOC on November 17, 2006, alleging age discrimination and retaliation for taking FMLA leave. After exhausting his administrative remedies, Plaintiff filed this lawsuit. The Amended Complaint (doc no 3), which now governs this action, contains the following claims for relief: (1) violation of the

---

[5]Plaintiff claims, however, that when he was not reinstated to the manager position after 90 days, Gerard told him he could not grieve that decision. The policy, however, indicates that Plaintiff did not need Gerard's permission to use the grievance and appeal procedure. See Policy #52: Grievance Procedure, Exh. P to Hospital's Reply Brief in Support of Motion for S.J. (doc no 61-7) (Step 1 of grievance procedure is to meet with the Human Resources Manager).

ADEA against the Hospital; (2) violation of FMLA against the Hospital; (3) violation of

the Colorado Anti-Discrimination Act ("CADA") against both Defendants: (4) outrageous

conduct against both Defendants; (5) intentional interference with prospective business

advantage against Quorum; and (6) tortious interference with contract against Quorum.

<u>Standards of Review and Burdens</u>

Summary judgment is appropriate when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56.  A factual issue is genuine if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S.

242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying 'a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim.'"

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the

presence of each element essential to the case."  *Id.*

The ADEA makes it unlawful for an employer to "discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  A plaintiff

alleging employment discrimination may prove intentional discrimination by direct or

indirect evidence.  In the absence of direct evidence, the analysis set forth in *McDonnell*

*Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for

assessing indirect, or circumstantial, evidence.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000); *see also Cortez v. Wal-Mart Stores, Inc.,* 460 F.3d 1268, 1273 (10th Cir. 2006) (burden-shifting approach used in disparate treatment claims under the ADEA).

Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination.  *Kendrick*, 220 F.3d at 1226.  The essential purpose of the *prima facie* test is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection."  *Id*. at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)).  *See also St. Mary's Honor Center*, 509 U.S. at 506 (*prima facie* case "in effect creates a presumption that the employer unlawfully discriminated against the employee") (quoting *Burdine*, 450 U.S. at 254) (alteration in quoted material).  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Kendrick*, 220 F.3d at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).  The plaintiff must show pretext by demonstrating that the defendant was more likely motivated by a discriminatory reason or that the defendant's proffered reason "is unworthy of credence."  *Id*. (quotation omitted);  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) (to show pretext, plaintiff must produce evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact

12

could find the reason unworthy of belief.")  (quotations omitted).  *See also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are:  (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

In an age discrimination case involving termination, a *prima facie* case ordinarily requires the plaintiff to show that he or she was: (1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age.  *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

A *prima facie* case of retaliation for exercising rights under FMLA involves the following:  (1) the plaintiff availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions.  *Morgan v. Hilti, Inc* ., 108 F.3d 1319, 1325 (10th Cir. 1997).

<u>Discussion</u>

A.  <u>Motion to Strike and Motion to Amend</u>

I first address Plaintiff's Motion for Leave to Amend Summary Judgment Responses (doc no 69).  Plaintiff wishes to amend his responses to the summary judgment motions by including references to the transcript of Abeyta's deposition, which was not in final form at the time the initial briefs were filed.  Because the amended briefs are not substantially different from the initial response brief, I will grant the motion and

will evaluate Plaintiff's submissions based on the amended response briefs.

In their Motion to Strike (doc no 62), Defendants seek to strike certain of Plaintiff's exhibits submitted with Plaintiff's response briefs in opposition to the motions for summary judgment, as well as portions of the briefs themselves.  I note that Plaintiff did not comply with my Pretrial and Trial Procedures in that the response briefs significantly exceed my 20-page limit and do not set forth the factual portions of the response as required by my procedures.  Nonetheless, since briefing is complete I will consider the issues on the merits and will not strike the Plaintiff's response briefs for failure to comply with my procedures.

Defendants first seek to strike Plaintiff's Exhibits 2, 10, 13, and 15, which are job performance reviews from January 2002, October 2002, September 2003, and March 2004, reviews of Plaintiff's performance while on the PIP, as well as a review from 2007 from Plaintiff's current employer.  Defendants argue that these should be stricken as irrelevant.  I disagree.  A plaintiff's previous performance could be a relevant factor when considering whether an employer's stated reason for a decision is pretextual.  Similarly, Plaintiff's compliance with the PIP is also relevant.  I will not strike these exhibits.

Defendants also object to Exhibit 3, which is offered to show the job responsibilities of Martinson, including scheduling.  Defendants further object to Exhibit 16, which demonstrates that after Plaintiff's discharge, the Hospital enacted a policy permitting unlicensed persons to perform respiratory therapy under certain conditions.  Defendants argue that these exhibits are not properly authenticated and are inadmissible.  However, Defendants do not dispute the authenticity of the documents.

14

Since any defect in Plaintiff's submission of these exhibits is curable, I will not strike Exhibits 3 and 16.

Defendants seek to strike the affidavits of several former Hospital employees, specifically Exhibit 6 (Jane Lupp Affidavit), Exhibit 7 (Thelma Jocelyn Torri Affidavit), Exhibit 8 (Diana Krausnick Affidavit), and Exhibit 9 (Martha Thompson Affidavit). These affidavits contain nearly identical statements regarding certain matters, including the affiants' previous work experience with Plaintiff, their opinions about the Hospital's use of progressive discipline, their opinion that it was always a manager's responsibility to work if no other staff was available for coverage, and the availability and use of temporary staffing services. Defendants object to this testimony on various grounds, including relevance and lack of personal knowledge. To the extent that the affidavits contain facts regarding these employees' direct and personal experience at the Hospital, I will permit them if past practice is relevant. However, I will disregard any conclusory opinions.

In addition, Defendants move to strike Paragraph 11 of Ms. Lupp's affidavit, in which she states her opinion that she was involuntarily terminated based upon her age, gender, and disability; she apparently pursued legal remedies and reached a resolution with the Hospital, the details of which are confidential. I agree with Defendants that this mere opinion, without more, is not relevant to these proceedings and will not be considered.

Defendants seek to strike the following portion of Paragraph 10 of Ms. Torri's affidavit on the grounds that it lacks a factual basis:

During my employment as CNO [Chief Nursing

Officer] for PMC [the Hospital], I reported to Greg Gerard.
Gerard had alluded to me on various occasions, the names
of those individuals whom he wanted fired. The individuals
were all over the age of 50, were some of the most long-
termed employees of PMC, and therefore, were among the
higher paid employees of PMC. Based on his providing me
with those names, I coined the term "hit list" to refer to those
individuals whom Gerard wanted fired.

Those included on the hit list were: Marjorie
Campbell, Diane Krausnick, Martha Thompson, Becky
Chambers and [Plaintiff]. I believe Jane Lupp, who had
been fired before I became CNO was on that list as well, but
had already been fired by the time I became CNO. When
learning of the individuals whom Gerard wanted to fire, I
refused to follow through with it and ended up resigning.
Since my separation from PMC in October, 2004, all of the
individuals on the hit list have been fired or otherwise
involuntarily separated.

Torri Aff., Exh. 7 to Response to Hospital's Motion for S.J. (doc no 58-8) at p. 5.

This affidavit can be read to state that Ms. Torri was told by Gerard–on more than one

occasion– that he wanted to fire Plaintiff, as well as other older employees, well before

the events which Defendants claim triggered his termination. Such statements would

plainly be evidence of pretext. However, this affidavit was verified by Ms. Torri on June

12, 2008, just five days after her deposition at which she testified as follows:

Q: At that meeting did you discuss George Chambers?

A: We discussed George, yes. And we discussed my term
of a "hit list" which I told Greg that that was my term, that it
wasn't something factual that had been said.

. . .

Q: And so just so I understand your testimony, you agree
that you apparently were the one at Prowers who coined the
term that there was allegedly a hit list at Prowers?

A: I said that was coined by me, yes.

Q: And it was not true?

A: It was a pattern that I seen but not a hit list *per se.* It was a pattern I was beginning to see.

Torri Depo., Ex. U to Defendants' Motion to Strike (doc no 62-4), 91:21-25 and 92:3-9.

Q: You then state in here, "I'm sorry for making a statement of having a hit list. It was a poor usage of words regarding the need to proceed with change and my perception of the direction and flow of the decisions being made at PMC." Is that a true statement?

A: I coined it. And my perception regretfully has come true.

. . .

Q: But actually you have no direct first-hand knowledge of any of the reasons why any of those individuals were no longer working at Prowers, do you?

A: That's correct. Only that they're gone and the result of their being gone.

*Id.*, 92:25-93:6, 93:23-94:2.

Q: . . . So it's correct that you had stated in this interview that it was your assumption or belief, that based upon the alleged attitudes or atmosphere created by Greg Gerard and Karen Bryant, that somehow they wanted to get rid of certain employees; is that right?

A: That's correct.

Q: It's nothing they actually said, it was just your impression or assumption based upon what you perceive to be their attitudes or the atmosphere created, correct?

A: That's correct.

*Id.*, 122:2-11.

Q: Yet you earlier testified you have no factual information regarding reasons or circumstances for those employees' departures from Prowers, do you?

. . .

A: No, I have no factual information.

*Id.*, 123:15-18, 124:5.

This deposition testimony of no factual information as to the reason for Plaintiff's termination is difficult, if not impossible, to reconcile with an affidavit a few days later that the supervisor who terminated Plaintiff "alluded" to Ms. Torri "on various occasions" that the supervisor wanted to fire Plaintiff and others. It seems plain that any such statements would be "factual information" concerning the reason for terminating Plaintiff.

Unfortunately, and as Defendants argue, this conflict in sworn testimony by a single witness presents the issue of whether Ms. Torri's affidavit is fabricated to create a sham issue of fact. The Tenth Circuit has established factors to consider: "[W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). A review of these considerations indicates the creation of a sham issue. Ms. Torri was being cross-examined during her earlier testimony and no re-direct questions were asked by her own counsel. Given the close temporal proximity, Ms. Torri presumably had access to all pertinent evidence for both her deposition and her affidavit. Certainly her earlier testimony does not indicate any confusion, nor does the affidavit seek to explain any alleged confusion. I also note, as did the *Nimmo* court, that Ms. Torri's affidavit makes no reference to her earlier unequivocal testimony that there was no factual basis for her assumptions.

18

In addition, as Ms. Torri confesses, her perceptions or conclusions were based on "attitude or atmosphere" with no factual basis or any first-hand knowledge of why employees were terminated. For Rule 56 purposes, an affidavit must set forth facts and not simply conclusory statements. *Banc Oklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999); *see* also *Bones v. Honeywell Intern., Inc.,* 366 F.3d 869, 875 (10th Cir. 2004) (unsubstantiated allegations carry no probative weight in summary judgment proceedings"). Accordingly, I will strike these portions of Paragraph 10 of the Torri affidavit. I will also strike Ms. Torri's statement that Gerard cut off access to the Hospital's grievance procedures, which is also conclusory and lacking any first hand knowledge.

Defendants also seek to strike Paragraph 7 of Ms. Krausnick's affidavit, regarding her reassignment shortly after Plaintiff's discharge and her later cut in hours and/or pay. It is unclear for what purpose these statements are offered, but to the extent they are based on personal knowledge I will permit them. Mr. Krausnick also opines that her layoff, as well as the layoff of two other employees (one aged 69 and one aged 33) in January 2008 was due to the Hospital's desire to fire more experienced and higher paid employees. I will disregard these conclusory opinions, but will accept the affidavit to the extent it sets forth facts about the layoffs.

Finally, Defendants argue that Paragraph 8 of Ms. Thompson's affidavit should be stricken. Ms. Thompson was laid off in February 2008; when she was told of the layoff, she herself stated "I guess I'm just too old." Thompson Aff., Exh. 9 to Plaintiff's Response to Hospital's Motion for S.J. (doc no 58-10). In response, the Chief Clinical Officer advised that she was being laid off because she was paid too much for the

clerical work she was then doing.  *Id.*  I agree with Defendants that Ms. Thompson's statement is conclusory and not admissible for Rule 56 purposes.  However, she may be competent to provide evidence as to whether she was doing clerical work at the time of the layoff.

Defendants also claim that certain arguments in Plaintiff's response brief should be stricken because they are unsupported by the record evidence.  I will evaluate the persuasiveness of Plaintiff's arguments as I do with any brief on a motion for summary judgment.  The applicable legal authority and admissible evidence will govern here, not any allegedly misleading arguments of counsel.

      B.    <u>Hospital's Motion for Summary Judgment</u>

Although not the first issue raised by the Hospital, I will address at the outset the adverse action that may form the basis of Plaintiff's ADEA claim.  Defendant notes that only conduct occurring within 300 days of Plaintiff's charge of discrimination can give rise to liability.  29 U.S.C. § 626(d); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002) (discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, as well as retaliatory adverse employment decisions are separate actionable unlawful employment practices; each discrete discriminatory act starts a new 300-day clock for filing charges based on that act).   Plaintiff filed his charge of discrimination with the EEOC on November 17, 2006.  Accordingly, liability under the ADEA may result from Plaintiff's discharge, but not his demotion and placement on the PIP, which occurred more than 300 days before the charge was filed.  However, I may consider the evidence of the earlier discipline as far as it relates to intent.  *Morgan*, 536 U.S. at 113 (filing time limits do not "bar an employee from using

20

the prior acts as background evidence in support of a timely claim."). The Hospital cites *Haynes v. Level 3 Comm., LLC*, 456 F.3d 1215, 1227 (10th Cir. 2006) for the proposition that evidence of alleged adverse actions occurring before the 300 day cutoff cannot be considered for any purpose. I do not read *Haynes* so broadly, as that case involved a plaintiff who was laid off pursuant to a neutral reduction in force policy. The plaintiff tried to show discrimination by arguing that an allegedly discriminatory disciplinary action put the plaintiff in the position to be subjected to the layoff. Because the earlier discriminatory act was time-barred, the Tenth Circuit ruled that it would not be considered for the purpose of showing intent for the purpose of the layoff. Here, in contrast, the matter involves the exercise of discretion by the same individuals in the decision to discipline Plaintiff in October 2005 and to terminate his employment in May 2006. Therefore, I conclude that evidence concerning the earlier employment action may be relevant to the later timely action. *Haynes*, 456 F.3d at 1223.

The Hospital argues that Plaintiff cannot establish a *prima facie* case of age discrimination because the incidents of misconduct and insubordination preclude a finding that Plaintiff was performing his job satisfactorily. Alternatively, they argue that even if Plaintiff establishes a *prima facie* case, he cannot rebut the Hospital's nondiscriminatory reason for discharging him, specifically that misconduct and insubordination. Because the burden to establish a *prima facie* case is light and Plaintiff appears to have performed satisfactorily with the exception of the two key incidents at issue here, I will examine whether Plaintiff has offered sufficient evidence to raise an issue of fact as to pretext. *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (burden at the prima-facie-case stage is *de minimis*),

As I have previously noted, ""[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."). Thus, even if the stated reasons later prove to be untrue, I must examine whether the supervisor believed those reasons and made a good faith decision at the time of the discharge. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Comp.,* 468 F.3d 1243, 1250 (10th Cir. 2006) (citations omitted).

I turn first to the decision to discipline Plaintiff for allegedly berating Stapel regarding a matter unrelated to his work. If this decision indicates pretext, it may bear on whether the ultimate termination decision was also a pretext for age discrimination. I conclude that no reasonable jury could find that Gerard and Bryant did not act in good faith in deciding to credit Stapel's version of the relevant events and to impose discipline. In his deposition, Plaintiff was asked if there was any reason for Gerard and Bryant to disbelieve Stapel and to believe Plaintiff; he responded in the negative. It is undisputed that Stapel reported to management that Plaintiff had confronted her in an angry and hostile manner regarding an issue that did not concern his work or department, used profanity, and said that he would "get" her. There is no indication that Stapel is a dishonest person or that the Hospital was aware of any animus she harbored

against Plaintiff that would have caused her to fabricate such a story. Bryant interviewed the available witnesses, who generally confirmed that Plaintiff appeared angry when he had approached Stapel. Bryant also had documentation of previous incidents involving Plaintiff losing his temper and using profanity at a coworker. Plaintiff offers no facts to suggest that Bryant and Gerard had reason to believe that Stapel's story was untrue, other than Plaintiff's denials, but used it nonetheless as a pretext to impose discipline because of discriminatory animus.

Plaintiff contends that Bryant's investigation was "biased" and a sham because she did not take or did not keep her notes, did not ask Plaintiff for a written response to Stapel's accusation, did not ask Plaintiff for a list of witnesses, and did not ask for a written statement from Abeyta. Bryant testified in her deposition that she believed Plaintiff had previously been dishonest about his sick time use (as evidenced by the warnings in his file). Nonetheless, this does not indicate age bias or that Bryant acted in bad faith in her investigation. Given that there is no evidence to dispute that Stapel did indeed make a complaint about Plaintiff and wrote her own statement on what had transpired, the lack of notes does not indicate that there was an unfair investigation. Similarly, since there were no other witnesses to the event, it is hardly surprising that Plaintiff was not asked for a list of witnesses. I also agree with Defendants that Abeyta's information was not exculpatory, but rather neutral, as it was consistent with either version of what allegedly occurred. Finally, Plaintiff argues that pretext is shown because the discipline was too harsh. Standing alone, without comparators or other indication that the discipline did not comply with the Hospital's usual practices, I cannot conclude that the severity of the discipline imposed suggests pretext. Even Plaintiff

agreed in his deposition that if Stapel's account were true, the alleged conduct would merit discipline.

Plaintiff also makes numerous arguments about what was not done to suggest that Stapel was not actually disturbed by Plaintiff's conduct. For example, Plaintiff argues that Stapel's failure to call security, to use an emergency button or to go directly to Bryant's office all indicate that her story was not credible. Again, however, the issue is whether Bryant and Gerard acted in good faith in believing her, not how frightened she was by her interaction with Plaintiff.[6] Similarly, Plaintiff contends that pretext is shown because Gerard and Bryant did not require Plaintiff to attend any anger management treatment, which indicates they did not really believe that Plaintiff had threatened Stapel. I disagree. Demoting Plaintiff and putting him on a PIP is ample evidence to indicate that Gerard and Bryant believed that Plaintiff's conduct was a serious infraction of the Hospital's work standards. Plaintiff's argument about what is the appropriate discipline for an employee with anger problems is an invitation to engage in precisely the type of second-guessing of business decisions that is inappropriate in these types of cases.

Focusing on the decision to terminate Plaintiff, I see no genuine issue of material fact regarding pretext. Plaintiff either was still on his PIP at the time or had just completed it, which is an important factor in evaluating the decision to impose a severe sanction. Once again, the entire report of misconduct came not from Gerard, whom

---

[6]Plaintiff makes the same type of argument with respect to Martinson, which I reject for the same reason. The mere fact that these employees did not act as if they believed they were under threat of imminent physical assault does not mean that they were not distressed by Plaintiff's allegedly aggressive behavior.

Plaintiff accuses of harboring age discriminatory attitudes, but from Martinson. There may be some ambiguity about who was responsible for scheduling and that Martinson could and perhaps should have directed another employee to work the shift or to have otherwise resolved priority in the vacation requests. Nonetheless, she appears to have been within her authority to direct Plaintiff to solve the problem or work the shift himself. Plaintiff was a supervisor, which was a position of some responsibility, and he defied a direct request from his superior. Again, Plaintiff in his deposition conceded that this could be construed as insubordination. Plaintiff believed that his suggested solution, using the student therapist with another licensed therapist on call, was sufficient, but Martinson disagreed. Because there was no formal policy at the time on the use of unlicensed respiratory therapists, and Martinson was new to the manager position, her insistence on another solution does not give rise to an inference of pretext.

Similarly, Martinson had reason to believe that Plaintiff was undermining her authority by telling other respiratory therapists not to answer the phone if called to cover the shift. Although Abeyta said she thought Plaintiff was joking, Martinson apparently received additional reports that indicated otherwise. Again, the issue is whether Martinson, as well as Bryant and Gerard, believed in good faith that Plaintiff had engaged in this conduct, not whether he actually intended to jeopardize patient care.

Plaintiff does not deny that he left the Hospital campus without permission on May 17, another reason given for his discharge.

Plaintiff denies making a violent threat to Martinson, and contends that he was misunderstood about his statement that the state would "cut her heart out." Again, however, even if this is in dispute, he does not deny other details of the conversation,

including his accusation that her management was poor and possibly illegal.  In light of the previous incidents and Plaintiff's apparent anger, there is no evidence to suggest that Bryant and Gerard did not in good faith believe Martinson's story that Plaintiff had been insubordinate and aggressive with her.

Plaintiff argues that no other employee had been terminated for failing to work a shift or for a clocking violation.  However, Plaintiff offers no evidence of a similarly situated younger employee, who had been disciplined within the previous year and put on a PIP, receiving more lenient treatment than Plaintiff for engaging in the same alleged misconduct.

Plaintiff also contends that pretext is shown by the Hospital's "history and pattern of terminating older employees."  Plaintiff's evidence is that a few older employees were terminated or laid off between 2001 and 2008 for reasons that are unclear.  In response, the Defendants have submitted data showing the ages of all employees involuntarily separated from 2001 to 2006, as well as the ages and positions of those retained. Defendants' data shows during this time period individuals of all ages, including a number of employees in their 20s, 30s and early 40s were involuntarily discharged, and that many employees over age 40 were retained.  See Exh. J, attached to Motion for Leave to File Supplement (doc no 40).  Plaintiff's conclusory assertions is not sufficient to raise a genuine issue of fact regarding any discriminatory pattern of discharging older employees.

Plaintiff further asserts that there were procedural irregularities involved in these events.  Specifically, Plaintiff argues that the Hospital failed to follow its "progressive discipline" policy and that Martinson had no authority to revoke Plaintiff's vacation

26

request.  The Hospital's policies set forth different levels of discipline, going from reprimand to warning, suspension, discharge, and immediate discharge.  Policy #51: Disciplinary Action, Exh. B-7 to Hospital's Motion for S.J. (doc no 34-17).  Under "Suspension," the policy sets forth that "An employee shall be suspended only once for each cause.  The second offense for the same act shall be disciplined by discharge if both acts occur within a one year time frame."  *Id*.  Discharge is justified by "Continued violation of conduct and rules . . . ."  *Id*.  Immediate discharge is permitted for "Gross violation of conduct or rules."  *Id*.  In addition, the policy provides that "No previous warning is necessary for suspension or discharge due to misconduct as defined in policy #53, UNACCEPTABLE CONDUCT."  *Id*.  Policy #53 includes as unacceptable conduct "Being insubordinate or deliberately failing to follow directions" and "Using abusive or profane language to fellow workers . . . ."  Policy #53: Unacceptable Conduct, Exh. B-8 to Hospital's Motion for S.J. (doc no 34-18).  I see no violation of the Hospital's policy on discipline, as it clearly reserved for itself the right to discharge an employee who engaged in the type of misconduct that Plaintiff was accused of without resorting first to lesser sanctions[7].  Given that the Hospital's policies expressly grant authority to management to approve or deny vacation requests, that authority inherently includes the right to revoke a previously granted request.

I note that there are two material factual disputes regarding Plaintiff's termination

---

[7]Plaintiff's affidavits from former employees which opine that the Hospital followed progressive discipline do not create an issue of fact in this regard.  The affiants appear to primarily address their own implementation of the policy and do not refer to any statements or practices by persons with the ability to bind the Hospital with respect to policy.

that arguably could be indicative of pretext. First, I agree with Plaintiff that there are issues of fact regarding whether he violated the rules regarding clocking in as a callback and that this may have been added on as an additional reason to justify the termination. Once again, however, the issue is not whether Plaintiff actually violated the callback rules but rather whether Martinson honestly believed that he did based on the evidence before her. Plaintiff claims he was given permission by another manager to clock in as a callback, but he offers no evidence to show that Martinson knew this. In addition, the email from Gerard, where he refers to Plaintiff as "behaving as someone who realizes he's not relevant anymore" and notes that "it is unraveling," is ambiguous and could possibly be construed as showing some kind of animus against Plaintiff.

Nonetheless, Plaintiff has the ultimate burden of showing that the reasons given for his discharge were false or otherwise unworthy of credence and that the real reason for his termination was age discrimination. I conclude that, even if these factual issues are resolved in Plaintiff's favor, in light of the strong evidence demonstrating that Plaintiff had violated numerous workplace rules, and given that Plaintiff was on a PIP at the time or had just finished it, no reasonable jury could conclude that the reason given for Plaintiff's discharge was false or pretextual. *Cf. Tyler v.RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (where plaintiff casts substantial doubt on many of the employer's multiple reasons for adverse employment action, the jury could reasonably find the employer lacks credibility). Here, Plaintiff has not cast "substantial doubt" on the primary reasons for the discharge. Rather, the undisputed evidence shows that Gerard received a credible report from a department manager that Plaintiff had left the campus without permission, had refused to comply with a reasonable

28

instruction and had undermined the manager's authority, and had been hostile with her. Most if not all of these actions were violations of the Hospital's conduct policies and provided grounds for discharge, particularly since Plaintiff had within the previous year been disciplined for another inappropriate workplace interaction. These reasons are not weak, implausible, incoherent, inconsistent, or otherwise unworthy of belief. Moreover, they are not rendered less credible by the ambiguous email and the possibly unjustified accusation of callback rule violations.

Plaintiff's FMLA claim fails for the same reason. Plaintiff has not sustained his burden to show that there are genuine issues of material fact regarding any causal connection between his taking of FMLA leave and the initial disciplinary decision, which occurred some three and a half months after his return from leave. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (three month interval between protected activity and adverse action, standing alone, is insufficient to show causation). Plaintiff's only evidence to show any causal connection is that Gerard was "cold" to Plaintiff after his return from leave. Any connection between Gerard's attitude and Plaintiff's leave is purely speculative. Plaintiff also contends that Gerard took away his budgeting responsibilities; however, Defendants have presented evidence that Gerard took budgeting away from all department managers around this time, not just Plaintiff. Finally, as discussed above, Plaintiff's evidence does not demonstrate that the discipline and termination decisions were pretextual. Accordingly, the Hospital is entitled to summary judgment on the ADEA and FMLA retaliation claims, as well as the Colorado Anti-Discrimination Act claim, which is analytically similar.

C.    Quorum's Motion for Summary Judgment

Quorum moves for summary judgment on the tort claims asserted by Plaintiff. These claims are all premised on the conduct of Gerard under a theory of *respondeat superior*.

First, Quorum argues that Plaintiff's outrageous conduct claim fails as a matter of law.  The elements of this tort are: (1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) resulting in severe emotional distress.  *Culpepper v. Pearl St. Bldg., Inc.,* 877 P.2d 877, 882 (Colo. 1994).  Outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (citations omitted).   To establish the third element, a plaintiff must present evidence that the defendant "engaged in outrageous conduct with the specific intent of causing severe emotional distress" or "acted recklessly with the knowledge that there was a substantial probability that [the] conduct would cause severe emotional distress."  *Id.* at 883.

Even drawing all inferences in favor of Plaintiff, none of the evidence presented shows that Gerard engaged in any conduct that approaches the standard required to succeed on this claim.  As I have already determined, Plaintiff cannot show that Gerard's decision to credit Stapel's version of her interaction with Plaintiff was not in good faith.  There is no dispute that Plaintiff's conduct violated the Hospital's workplace standards and merited discipline.  Similarly, as discussed above, Plaintiff cannot demonstrate that Gerard engaged in any wrongful conduct in connection with the

30

decision to discharge Plaintiff.  Given the strong evidence demonstrating that Plaintiff

had engaged in behavior meriting discipline, no reasonable jury could find that this

employment decision was "beyond all possible bounds of decency."  I agree with

Quorum that judgment should enter in Quorum's favor as a matter of law.

Plaintiff argues that outrageous conduct includes Gerard ignoring exculpatory

evidence from Abeyta regarding Plaintiff's confrontation with Stapel.  However, as

noted, I disagree that Abeyta's report was exculpatory.  Similarly, Plaintiff contends that

it was outrageous for Martinson to demand that Plaintiff cancel his out of state family

wedding plans.  It may have been unfair or unwise but it is not so intolerable as to

constitute actionable outrageous conduct.  Also, Plaintiff presents no evidence that

Martinson is an agent of Quorum; therefore, her actions do not create liability for this

Defendant.

Quorum also argues that Plaintiff's claims for tortious interference with contract

and prospective business advantage fail because he was an at-will employee and

because Gerard, as a representative of the Hospital, is not a third party for the purposes

of a tortious interference claim.  Plaintiff's theory relies on the assumption that he had a

contract of employment with the Hospital, or an expectation of a continued employment

relationship.  To establish tortious interference with a contract, a plaintiff must show: (1)

the plaintiff had a contract with another party; (2) the defendant knew or should have

known of such contract's existence; (3) the defendant intentionally induced the other

party to the contract not to perform the contract with the plaintiff; and (4) the defendant's

actions caused the plaintiff to incur damages.  *Lutfi v. Brighton Community Hosp. Ass'n*,

40 P.3d 51, 58 (Colo. App. 2001).  The third element specifically requires that the

interference be both intentional and improper. *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995). Similarly, a claim of tortious interference with a prospective contractual relation requires a showing that the defendant intentionally and improperly interfered with the plaintiff's potential business relationship with a third party. *Employment Television Enterprises, LLC v. Barocas*, 100 P.3d 37 (Colo. App. 2004).

Quorum argues that Plaintiff cannot demonstrate the existence of a valid contract of continued employment or an expectation of a continued relationship. Plaintiff admitted as much in his deposition and stated that he understood his employment could be terminated at any time. Moreover, the Hospital's personnel policies expressly disclaim any contract of employment. Exh. B-4 to Hospital's Motion for S.J. (Doc no 34-14). The Hospital's disciplinary policies and the warnings given to Plaintiff also unambiguously explain that he could be discharged for further infractions.

I agree with Quorum that a heightened showing is required to show that Gerard was a "third party" for the purposes of these torts. In general, a party cannot intentionally interfere with a contract to which it is a party; since a business entity can only act through its agents, a corporate agent cannot be liable for allegedly interfering with the entity's contract unless the agent is solely motivated by the desire to harm one of the contracting parties or interfere in the contractual relations. *W.O. Brisben Companies, Inc. v. Krystkowiak*, 66 P.3d 133, 136 (Colo. App. 2002). Plaintiff offers no evidence to show that Gerard was solely motivated by an intent to harm Plaintiff or the Hospital. In addition, as noted above, Gerard did not engage in any wrongful conduct in determining to discipline and to ultimately discharge Plaintiff.

Because Plaintiff's tort claims fail as a matter of law and Plaintiff does not have

evidence to create a genuine issue of material fact regarding pretext with respect to his discrimination claims, I conclude that summary judgment should enter in favor of both Defendants.

Accordingly, it is ordered:

1.    Plaintiff's Motion for Leave to Amend Summary Judgment Responses (doc no 69) is granted.

2.    Defendants' Motion to Strike (doc no 62) is granted in part and denied in part as described above.

3.    The Motion for Summary Judgment (doc no 34) filed by Defendant Prowers County Hospital District and the Motion for Summary Judgment (doc no 35) filed by Defendant Quorum Health Resources LLC are granted.  Summary judgment shall enter in favor of these Defendants and against Plaintiff on all claims.

4.    Quorum's Second Motion for Summary Judgment (doc no 63) and Plaintiff's Motion to Strike Quorum's Second Motion for Summary Judgment (doc no 67) are denied as moot.

5.    Defendants may have their costs.

DATED at Denver, Colorado, on March 31, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge